# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| JOHN B. PIDCOCK, as creditor trustee of the other Schwab Industries Inc. Creditor Trust, | ) ) ) | CASE NO. 5:16-cv-317 |
| | ) | |
| APPELLANT, | ) ) | JUDGE SARA LIOI |
| | ) ) | MEMORANDUM OPINION AND ORDER |
| vs. | ) ) ) | |
| JERRY A. SCHWAB, et al., | ) ) | |
| APPELLEES. | ) ) | |

This matter is before the Court on the appeal of plaintiff/appellant[1] John B. Pidcock, as creditor trustee ("Pidcock" or "creditor trustee") of Schwab Industries, Inc. Creditor Trust pursuant to 28 U.S.C. § 158(a)(1) and Bankruptcy Rule 8003 from two orders entered by the United States Bankruptcy Court, Northern District of Ohio, Adversary Case No. 12-06022 ("Adversary Case"): (1) the order, and related memorandum of decision ("MOD"), of the bankruptcy court granting summary judgment in favor of defendants/appellees (Doc. Nos. 20-12 and 20-11,[2] respectively); and (2) the order of the bankruptcy court denying plaintiff/appellant's

---

[1] Appellant creditor trustee is the plaintiff in the adversary proceeding.

[2] The MOD is found at *In re SII Liquidation Co.*, No. 10-60702, 2016 WL 197570 (Bankr. N.D. Ohio Jan. 15, 2016) ("*Schwab*"), and when referring to the MOD herein, the Court will refer to the Westlaw citation rather than the docket citation.

motion to strike defendants/appellees' affirmative defenses (Doc. No. 20-7 ["Order"]). (Doc. No. 1["Appeal"] at 2.)[3]

For the reasons that follow, the bankruptcy court's orders are affirmed.

## I. BACKGROUND

This case has a long history. The Court will briefly recite enough history here to provide context, with more detail provided later in the opinion as necessary for the Court's analysis. Schwab Industries, Inc. ("Schwab Industries") was a family owned concrete business headquartered in Dover, Ohio, with operations in Ohio and Florida. *Schwab*, 2016 WL 197570, at *1. The three defendants/appellees in the instant action—Jerry Schwab, Donna Schwab, and David Schwab (the "Schwabs")—owned Schwab Industries[4] and were directors of the company. *Id*.

An economic downturn led to a Chapter 11 bankruptcy filing on February 28, 2010 by Schwab Industries and its affiliates ("debtors"). United States Bankruptcy Court, Northern District of Ohio Case No. 10-60702 ("Bankruptcy Case"). The debtors were unable to secure sufficient post-petition financing to permit reorganization, and their assets were liquidated through an auction sale in the Bankruptcy Case. *Id*. Cement Resources, LLC ("CR") was the stalking horse bidder,[5] but debtors' assets were ultimately sold to Oldcastle Materials, Inc. ("Oldcastle") and Resource Land Holdings, LLC ("RLH"). *Id*. The sale to Oldcastle and RLH was approved by the bankruptcy court after a hearing, and a sale order was entered May 28,

---

[3] All references to page numbers are to the page identification numbers generated by the Court's electronic filing system.

[4] Another family member—Mary Lynn Schwab—was also an owner of Schwab Industries, but was dismissed as a defendant from this action. *Schwab*, 2016 WL 197570, at *1 n.3.

[5] The initial bidder with whom the debtor negotiates a purchase agreement is called the "stalking horse" bidder.

2010. The sale order found that "the sale was made in good faith and that the purchase price was fair and reasonable, [and made] findings that dealt directly with Debtors' conduct during the sale process." *Id.* at *5.

During the Bankruptcy Case, Pidcock served as a financial advisor to the Official Committee of Unsecured Creditors ("Committee"). *Id.* at *1 n.1. Pidcock brings this Adversary Case as creditor trustee, alleging that the Schwabs, as directors and shareholders of Schwab Industries, breached their fiduciary duties and harmed the estate. Specifically, Pidcock alleges that the Schwabs elevated their personal interests over the interests of the debtors and creditors during the bankruptcy sale of debtors' assets by negotiating side agreements with CR and Oldcastle for post-sale management positions and compensation, which diminished the sale value of the assets. *Id.* at *2.[6]

The Schwabs moved for summary judgment, arguing that adversary claims are barred by res judicata, and the bankruptcy court granted the motion. Pidcock appealed and filed his appellant's brief (Doc. No. 18 ["Brief"]). Appellees filed a redacted and unredacted opposition brief (Doc. Nos. 20 and 22 ["Opp'n"], respectively), as did the creditor trustee with respect to his reply brief[7] (Doc. Nos. 25 and 26 ["Reply"], respectively).

The Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158(c)(1)(B). The bankruptcy court's order granting summary judgment to defendants/appellees is a final appealable order pursuant to 28 U.S.C. § 158(a)(1). *In re Midway Motor Sales, Inc.*, 407 B.R.

---

[6] Pidcock also claims that the Schwabs breached their fiduciary duty by failing to obtain a $3 million dollar refund of insurance premiums, which Pidcock contends was not addressed by the bankruptcy court in the MOD. (Brief at 464.) The bankruptcy court did, however, identify the insurance policies in connection with the Schwabs' alleged self-dealing: "[I]n exchange for a $3 million contribution, [the Schwabs] would receive a fifteen percent (15%) equity stake in Cement Resources[.]" *Schwab*, 2016 WL 197570, at *3.

[7] The Court's references herein to the opposition and reply briefs are to the unredacted versions.

442 (Table), 2009 WL 1940719, at *1 (6th Cir. July 6, 2009) ("An order granting summary judgment is a final order.") (citation omitted).

## II. ISSUES ON APPEAL

1. Whether the bankruptcy court's application of the *res judicata* doctrine to bar Appellant's claims was based on an overly-rigid interpretation of Sixth Circuit precedent as applied to bankruptcy sale orders.

2. Whether the bankruptcy court erred in ruling that Appellant's claims were barred by *res judicata* under circumstances where (i) Appellant's claims were transactionally distinct from the claims at issue in the sale-approval process, and (ii) Appellant did not have a full and fair opportunity to litigate his claims in the sale-approval process because Appellees' multi-million dollar side deals were concealed from the bankruptcy court and creditors.[8]

3. Whether the bankruptcy court erred in ruling that the "plausibility" pleading standard of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), does not apply to affirmative defenses.

(Brief at 425-26 (footnote added).)

## III. APPEAL OF ORDER GRANTING SUMMARY JUDGMENT

**A. Standard of Review**

Under Bankr. R. 7056, Fed. R. Civ. P. 56 governs motions for summary judgment in adversary proceedings in bankruptcy court. A grant of summary judgment by the bankruptcy court is reviewed *de novo,* using the same Rule 56 standard as used by the bankruptcy court. *Williams v. Mehra,* 186 F.3d 685, 689 (6th Cir. 1999) (en banc).

---

[8] With respect to issue 2, Pidcock contends that the bankruptcy court incorrectly applied the Sixth Circuit precedent of *Winget v. JP Morgan Chase Bank,* 537 F.3d 565 (6th Cir. 2008) in concluding that the adversary case was barred by res judicata. In *Winget*, various businesses owned by plaintiff were sold in bankruptcy pursuant to Section 363 of the Bankruptcy Code. Winget later sued to extinguish his personal liability (guaranty) to lenders that had advanced credit to plaintiff's businesses on the grounds that the lenders' pre-sale conduct devalued the businesses. The district court dismissed the complaint, holding that Winget's claims were barred by res judicata. *Winget,* 537 F.3d at 567.

4

Summary judgment is proper if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing a motion for summary judgment, the evidence, all facts, and any inferences that may be drawn from the facts, must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). To prevail, the non-movant must show sufficient evidence to create a genuine issue of material fact. *Klepper v. First Am. Bank,* 916 F.2d 337, 342 (6th Cir. 1990). A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Entry of summary judgment is appropriate "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

Under this standard, the bankruptcy court's legal determinations are reviewed de novo, *Behlke v. Eisen (In re Behlke),* 358 F.3d 429, 433 (6th Cir. 2004). Findings of fact, however, are not set aside unless clearly erroneous. *In re Aubiel*, 534 B.R. 300, 302 (B.A.P. 6th Cir. 2015).

## B. Res Judicata

Appellant does not take issue with the four elements applied by the bankruptcy court to establish res judicata:

> (1) a final decision on the merits by a court of competent jurisdiction, (2) a subsequent action between the same parties or their privies, (3) an issue in the subsequent action which was litigated or should have been litigated in the prior action, and (4) an identity of the causes of action." *Howe v. City of Akron,* [801 F.3d 718, 742] (6th Cir. 2015) (other citations omitted). As the proponents of the doctrine, Defendants bear the burden of proof. *TolTest, Inc. v. N. Am. Specialty*

5

*Ins. Co.,* 362 F. App'x 514, 516 (6th Cir. 2010) (unpublished) (citing *Winget v. JP Morgan Chase Bank,* 537 F.3d 565, 572 (6th Cir. 2008)).

*Schwab*, 2016 WL 197570, at *5-6.

The first two elements were not disputed by the parties before the bankruptcy court (*id.* at *6), and Pidcock maintains that only elements 3 and 4 of the bankruptcy court's res judicata analysis are challenged on appeal.[9] (*See* Brief at 436.)

## C. Element 3 - Should Breach of Fiduciary Duty Claims Regarding Self-Dealing Have Been Brought During the Sale Process

> This prong of res judicata aims to "compel litigants to bring all related claims in a single lawsuit." *Heike,* 573 Fed. App'x [476,] 481[6th Cir. 2014] (citing *Wilkins v. Jakeway,* 183 F.3d 528, 532 n.4 (6th Cir.  1999)). According to the Sixth Circuit, the key focus is not whether the claim is compulsory, but "whether the claim should have been considered during the prior action." *Sanders Confectionery,* 973 F.2d 474, 484 [(6th Cir. 1992)].

*Schwab*, 2016 WL 197570, at *7.

"To determine whether an issue should have been litigated in an earlier lawsuit, the Sixth Circuit says that '[w]here the two causes of action arise from the same transaction, or series of transactions, the plaintiff should have litigated both causes in the first action and may not litigate the second issue later.'" *SII Liquidation Co.*, No. 10-60702, 2014 WL 5325930, at *9 (Bankr. N.D. Ohio Oct. 17, 2014) ("*Goddard*") (quoting *Holder v. City of Cleveland,* 287 F. App'x 468, 471 (6th Cir. 2008) (further citation omitted)). The issue, then, is whether the adversary claims

---

[9]  Pidcock's brief is, unfortunately, confusingly organized. Section A.1.a. is completely misplaced, as it constitutes an overview – an introduction, if you will – as to *why* the third and fourth *Winget* factors for testing res judicata do not apply. It is true that the bankruptcy court's decision "was largely based on its . . . perception that the Sixth Circuit's decision in *Winget v. JP Morgan Chase Bank, N.A..*, 537 F.3d 565 (6th Cir. 2008), mandated dismissal of the case on *res judicata* grounds[,]"(Brief at 436), but beyond that, Pidcock's very detailed attempt to distinguish *Winget* does no more than needlessly complicate the argument. This Court need only analyze the third and fourth res judicata factors of the *Winget* test (*i.e.,* the only factors challenged by Pidcock) to determine whether the bankruptcy court was correct in its analysis.

regarding the Schwabs' self-dealing to the detriment of the estate should have been brought during the sale process in the Bankruptcy Case.

Pidcock maintains that the answer is "no" because the bankruptcy court erroneously applied *Winget* in analyzing the third prong of the res judicata analysis, and because he did not have a full and fair opportunity to bring these claims during the sale process.

### 1. CR's and Oldcastle's negotiations with the Schwabs

The creditor trustee contends the adversary claims could not be brought during the Bankruptcy Case due to the Schwabs' "affirmative concealment of the breadth of the negotiations with both Cement Resources and Oldcastle." *Schwab*, 2016 WL 197570, at *8. Affirmative concealment may prevent the application of res judicata to bar subsequent litigation, but mere silence is not enough. "[P]roof of something akin to fraudulent concealment is necessary." *Id.* (citing *Browning v. Levy,* 283 F.3d 761, 770 (6th Cir. 2002)). The elements of fraudulent concealment are:

> (1) wrongful concealment of action, (2) failure to discover the operative facts of the claim until after the statute of limitation runs, and (3) exercise of due diligence until discovery of the operative facts. *Carrier Corp. v. Oyi,* 673 F.3d 430 (6th Cir. 2012) (citation omitted).

*Id.*

Applying *Winget*, the bankruptcy court concluded that the Schwabs' negotiations with CR and Oldcastle were not affirmatively concealed. Pidcock contends that the bankruptcy court incorrectly applied *Winget* in reaching this conclusion.

### Negotiations with CR were not concealed

The bankruptcy court found the record established that the Schwabs' negotiations with CR were known by the parties to the sale process and to Pidcock during the Bankruptcy Case.

7

*See id.* at *2 and *8. For example, the Committee filed objections in the bankruptcy case regarding the bid procedure and appointment of CR as the stalking horse bidder, citing CR's negotiations with the Schwabs and other possible interference by the debtors with the competitive bidding process. Following a hearing, however, the parties submitted an agreed order stating that "[t]he objections of the Committee of Unsecured Creditors and [other creditor] are resolved." *Id.* at *3 (quoting the record). During the sale process, the Committee renewed its objections regarding self-dealing, calling the CR bid "suspect," [and] stating "Debtors' insiders [the Schwabs] have a strong incentive to support the Cement Resources bid notwithstanding the fact that it may cause significant harm to unsecured creditors, and that their business judgment is hopelessly conflicted." *Id.* at *4 (quoting the record). The allegations in the first amended complaint in the Adversary Case—that the Schwabs' self-dealing with CR for their own personal gain breached their fiduciary duty and resulted in a reduction of the sale price and devaluation of the estate (*see* Doc. No. 20-4 ¶¶ 1-4)—are essentially the same as the objections made by the Committee during the Bankruptcy Case (*see e.g.* Doc. No. 20-45 ¶¶ 8-9, 27; Doc. No. 20-67 ¶¶ 3, 4, 6, 20, 30, 31).

Applying *Winget*, the bankruptcy court concluded that, even though Pidcock and the Committee may not have known particular details of the negotiations between the Schwabs and CR, they were aware of the self-dealing nature of the negotiations "with ample time to, at a minimum, maintain its objection or make further inquiry. Consequently, the court cannot find affirmative concealment with regard to the Cement Resources deal." *Schwab*, 2016 WL 197570, at *8 ("The *Winget* case is instructive at this point because Winget argued he did not have all the facts to bring the claim during the bankruptcy case. The Sixth Circuit rejected the argument,

finding 'the claims Winget brings in the Complaint are largely identical to the arguments Winget made in its objection to the Sale Order, which it later withdrew.' [*Winget,* 537 F.3d at 580]").

### *Negotiations with Oldcastle*

The bankruptcy court came to the same conclusion regarding Oldcastle's negotiations with the Schwabs. Finding that the Oldcastle discussions may not have been as open as the CR negotiations, the bankruptcy court nevertheless concluded the record established that the Committee and Pidcock were aware of the existence and nature of the discussions between Oldcastle and the Schwabs. *Id.* The bankruptcy court cited the testimony of Pidcock as an example.

> Most damning for Plaintiff is his own admission he knew, around May 21, 2010, that the Schwabs had been communicating with Oldcastle about side agreements:
>
>> Q: And it states on page 2 of the letter[10] that Old Castle (sic) had discussions with the Schwab family regarding their going forward role with the business operations of Old Castle and has entered into discussions with certain members of the Schwab family about the possibility of retaining some or all of them after the closing of the sale. And then it continues that Oldcastle has had discussions regarding future consideration in exchange for value including vehicles and other physical assets owned by the Schwab family that are used in the debtors' business operations and non-compete agreements. And you read this on or around May 21, 2010, right?
>> A: Yes.
>
> (Depo. of John B. Pidcock, pp. ECF 207-1, pp. 109:21–110:10.)
>
> His testimony indicates that he inquired about the specifics of the deal, which no one divulged:
>
>> A: They wouldn't disclose any of the terms because nothing was agreed to. It's not atypical for in a transaction to have some transition agreements with current management. So it's not surprising that they would have these conversations. I would be surprised that they didn't

---

[10] The letter referred to here is the cover letter to Oldcastle's bid for debtors' assets.

> have these conversations, however, what we didn't know was what the makeup of the agreements would be, what they would look like, typically it's salary, noncompete, that type of thing.
>
> (*Id.* at 111:4–13) Not only does he admit that he was aware that Defendants were in discussions, he also indicated such discussions were not uncommon.

*Id.* at *8-9 (footnote added).

At the sale hearing, the bankruptcy court questioned Oldcastle's counsel regarding his client's negotiations with the Schwabs, to which counsel responded:

> And we saw in the [CR] bid that they were negotiating to give employment agreements to management as well as an equity piece in the acquiring entity to Debtors' management. So we said okay. It looks like management is favoring that bid because they are doing that. We have no choice but to propose the same thing to management, at least, to equalize the playing field. So my client prepared some management agreement and a performance agreement and submitted it to the Schwabs . . . I don't believe they've responded to the agreement.
>
> (Transcript of Hearing held 5/28/10 at 60:7-18, Main Case ECF No. 1118)

*Id.* at *9.

Based on this record, the bankruptcy court found that:

> [t]he sum of the above leads the court to the inescapable conclusion that the negotiations with Oldcastle were not concealed. Although the specific terms were not known, there is no indication that anyone pressed the issue or made diligent efforts to ascertain the terms. The court cannot find that affirmative concealment bars application of res judicata, nor that concealment was a bar to bringing these claims earlier in this case.

*Id.*

##### 2. *The bankruptcy court did not err in applying Winget to find there was no affirmative concealment of the Schwabs' discussions with CR or Oldcastle*

Pidcock contends that the facts in *Winget* are distinguishable from the Adversary Case, and the bankruptcy court erroneously applied *Winget* to conclude that the Schwabs' side agreement negotiations were not affirmatively concealed. The Court disagrees.

First, the creditor trustee argues that, in *Winget*, the plaintiff knew all of the material facts supporting his claim one year before the sale in the bankruptcy case, and filed an objection to the sale motion regarding the alleged wrongful conduct of the lenders. Winget later withdrew the objection, however, and the bankruptcy court approved the sale of the assets. (Brief at 436-38.) Unlike *Winget*, appellant contends the "material facts" regarding Oldcastle's negotiations[11] with the Schwabs were concealed from the Committee, and the facts that were known were provided only about one week before the bankruptcy sale.

> The Committee simply did not know there were any insider side deals. The objections filed by the Committee (BK Doc. Nos. 378,[12] 434[13]) *did not* include any objections with respect to the Oldcastle negotiations or side agreements simply because at the time, the Committee was completely unaware of those facts.

(Brief at 441 (footnotes added).)

---

[11] The Court focuses its analysis the information available to the Committee regarding the negotiations between the Schwabs and Oldcastle (who was the successful buyer in the bankruptcy sale) because, as appellant concedes, the Committee's knowledge regarding CR's negotiations with the Schwabs "is irrelevant to this analysis because Cement Resources was not the winning bidder." (Brief at 441 n.4.)

[12] May 9, 2010 objection of the Committee to debtors' motion for revised bidding procedure. (Doc. No. 20-45.)

[13] May 21, 2010 objection of the Committee regarding sale process and sale to CR because of, among other reasons, concerns that the Schwabs' negotiations regarding continuing management roles post-sale may cause harm to unsecured creditors. (Doc. No. 20-67 at 5450-51.)

11

It is true that the Committee's objections addressed CR, not Oldcastle, but that is because those objections were filed *before* Oldcastle's bid on May 21, 2010, in which Oldcastle disclosed its negotiations with the Schwabs:

> Oldcastle has had discussions with the Schwab family regarding their going-forward role with the business operations of Oldcastle, and has entered into discussions with certain members of the Schwab family about the possibility of retaining some or all of them after the closing of the sale. In addition, Oldcastle has also had discussions with the Schwab family regarding future consideration in exchange for certain value, including vehicles and other physical assets owned by the Schwab family that are used in the Debtors' business operations and non-compete agreements. No final arrangement, however, has been reached between Oldcastle and the Schwab family.

(Doc. No. 20-71 at 5481.)

Oldcastle's bid shows that the Schwabs' discussions with Oldcastle were largely the same as their discussions with CR – that is, self-dealing in nature. The negotiations between Oldcastle and the Schwabs were also described at the sale hearing by Oldcastle's counsel, who stated that management and performance agreements had been submitted to the Schwabs, but they had not yet responded. *Schwab*, 2016 WL 197570, at *3-4 (quoting sale hearing transcript).

When questioned by the bankruptcy court at the sale hearing, debtors' counsel advised the bankruptcy court that, although he did not know specific details, counsel did know that the Schwabs had discussions with both CR and Oldcastle. *Id.* at *4. Counsel for the Committee, Aaron Hammer ("Hammer"), also attended the sale hearing on May 28, 2010, stating that the Committee members had been very involved throughout the entire process. Even in light of the Committee's knowledge of discussions between Oldcastle and the Schwabs concerning post-sale compensation and involvement in the businesses, Hammer advised the bankruptcy court at the sale hearing that:

12

today, your Honor, I believe is that crowning moment where the right result is before your Honor. Tremendous amount of time and brain power has been put into a process that brings us here before you today. With Oldcastle having been the highest and best bidder, the Committee can support the Debtor's auction and sale process under the terms that will be presented to you in the proposed Sale Order. That includes the factual findings as to good faith conduct and fairness in the entire process. And we're comfortable with that Sale Order. . . . There stands a nice prospect for a decent recovery for unsecured creditors and for the estate to be left in good shape post-closing.

(Doc. No. 20-47 at 4982-83.)

The kind of concealment of material facts that will bar the application of res judicata must be affirmative—"'mere silence or unwillingness to divulge wrongful activities is not sufficient.'" *Browning*, 283 F.3d at 770 (quoting *Helmbright v. Martins Ferry,* No. 94–4089, 1995 WL 445730, at *1 (6th Cir. July 26, 1995)). "'There must be some trick or contrivance intended to exclude suspicion and prevent inquiry.'" *Id*. (quoting *Pinney Dock and Transport Co. v. Penn Cent. Corp.,* 838 F.2d 1445, 1467 (6th Cir. 1988)). The concealment must be of the sort that would "deceive a reasonably diligent plaintiff[.]" *In re Polyurethane Foam Antitrust Litig.*, 152 F. Supp. 3d 968, 980 (N.D. Ohio 2015) (regarding affirmative concealment that must be shown to toll a limitations period) (citing *Browning,* 283 F.3d at 770).

There was no trick or contrivance that concealed Oldcastle's discussion with the Schwabs, or the nature of those discussions, which were essentially the same as the Schwabs' discussion with CR.[14] The Committee was highly suspicious of the Schwabs' self-dealing with CR, aware that such self-dealing may diminish the estate, and objected to both during the Bankruptcy Case. "Although the specific terms were not known, there is no indication that

---

[14] For example, the discussions between the Schwabs and CR included continuing in management and equity ownership post-sale (Doc. No. 29-45 ¶ 8), and similar discussions between Oldcastle and the Schwabs were disclosed in Oldcastle's bid (Doc. No. 20-71 at 5481) and in open court by Oldcastle's counsel. *Schwab*, 2016 WL 197570, at *3 (quoting sale hearing transcript).

13

anyone pressed the issue or made diligent efforts to ascertain the terms."[15] *Schwab*, 2016 WL 197570, at *9.

Pidcock's argument that this case is distinguishable from *Winget* because Winget knew of his adversary claims for a longer period of time before the bankruptcy sale than the claims were known in this case is irrelevant to the affirmative concealment analysis. The record in the Bankruptcy Case regarding the Schwabs' discussions with Oldcastle, the objections to the Schwabs' self-dealing in the Bankruptcy Case, and the similarity of those objections to the adversary claims, belies Pidcock's affirmative concealment argument. *Winget*, 537 F.3d at 580.

Thus, the Court finds that the bankruptcy court did not err in applying *Winget* to conclude that the Schwabs' insider deals were affirmatively concealed in the Bankruptcy Case.

### 3. *Breach of fiduciary claims should have been brought during the sale process*

Having determined that there was no affirmative concealment, the bankruptcy court turned to the issue of whether the adversary claims—that the debtors' assets were sold below their value because of the Schwabs' pre-sale self-dealing—should have been brought during the sale process. The bankruptcy court found this type of attack on the asset sale price similar to *Winget*, where the Sixth Circuit applied res judicata to bar Winget's claims, finding: "'As Winget's claims attack the Defendants' pre-bankruptcy actions and allege that the Defendants deliberately devalued the assets of Deluxe prior to its bankruptcy proceeding and subsequent sale, those claims would have had a direct effect on the assets in the bankruptcy proceeding.'" *Schwab*, 2016 WL 197570, at *10 (quoting *Winget*, 537 F.3d at 579).

---

[15] Appellant argues that the bankruptcy court found that the Committee had been kept in the dark as to the Schwabs' negotiations with Oldcastle, with citation to the MOD. (Brief at 441-42.) The language cited, however, is not from the court's holding, but from dicta after the bankruptcy court rendered its decision, which begins with the sentence: "This decision is not without moral unease." *Schwab*, 2016 WL 197570, at *11.

The bankruptcy court likened Pidcock's claims to those in *Winget*, because

> [t]he entire premise of Plaintiff's complaint is that the assets sold for less than they would have but for Defendants' actions, an attempt repudiated by *Winget*. This exact issue is raised in this adversary [proceeding], with Plaintiff alleging that but for Defendants' side agreements, the auction of Debtors' assets would have resulted in a higher sale price. This is precisely the issue that was at issue during the sale process, rendering this claim one that should have been brought at that time.

*Id.*

Pidcock contends that the bankruptcy court erroneously compared his claims to *Winget* because, unlike *Winget*, he does not seek to upset the results of the bankruptcy asset sale, and valuation of the assets sold in bankruptcy are not required to calculate damages resulting from the Schwabs' breach of fiduciary duty. (Brief at 443.) As Pidcock describes it:

> Appellant's damages can [be] shown by evidence establishing (1) that the top two bidders were reserving money to fund the insider side deals which resulted in a lower sale price for Debtors' assets, which the bankruptcy court already acknowledged, *Pidcock v. Schwab*, 2016 Bankr. LEXIS 146, at *16 ("Were it not for the side agreement, Cement Resources *may have been able to* pour more money toward the asset purchase rather than direct money toward the individual agreements, thereby providing a larger return to the estate. And *the indications are* Oldcastle's bid did not exceed its willing purchase price, leaving the firm impression money remained on the table."); and (2) that selling the Corkscrew property in an expedited manner (which was necessary due to Appellees' conduct) resulted in a sale price $6 million less than the most conservative appraisal of liquidation value.

(Brief at 444 (emphasis added).)

While Pidcock may not seek to upset the bankruptcy sale, his characterization of what is necessary to calculate damages requires a *valuation of what the assets would have sold for* if the Scwhabs had not allegedly breached their fiduciary duty by self-dealing. Pidcock claims that CR and Oldcastle *may have* paid more were it not for the insider deals, but even if this were the case,

how much more is unknown and theoretical. If Pidcock were to prove his breach of fiduciary duty claims, the Court would be required to determine if CR and Oldcastle would have paid more for debtors' assets absent the insider deals with the Schwabs, and how much more. This determination would require a revaluation of debtors' assets. Had those claims been raised during the sale process, the bankruptcy court could have determined at that time whether the insider deals were improper and if, and how, those deals impacted the sale price and the value of the assets to the estate.

Thus, the bankruptcy court did not err in applying *Winget* to conclude that the third element of res judicata is satisfied in this case.

### 4.  *Pidcock had a full and fair opportunity to pursue breach of fiduciary claims*

Pidcock also argues that the third prong of the res judicata analysis cannot be satisfied because if the sale was delayed to pursue the breach of fiduciary duty claims, the debtors' assets may have decreased in value as a result. Thus, Pidcock contends, the Committee did not have a full and fair opportunity to pursue those claims during the narrow time window of the sale process, further distinguishing this case from *Winget* where Winget was aware of his adversary claims one year before the sale. *Cisneros v. Randall*, No. 3:06-0190, 2006 WL 2037561, at *5 (M.D. Tenn. July 17, 2006) ("Although mostly invoked in the context of collateral estoppel, courts do recognize an exception to the application of *res judicata* [ ] under federal common law. As a matter of federal law, *res judicata* principles do not apply where the party against whom an earlier decision is asserted did not have a full and fair opportunity to litigate the claim or issue decided by the first court.") (internal quotation marks omitted) (quoting *Fellowship of Christ*

*Church v. Thorburn,* 758 F.2d 1140, 1144 (6th Cir. 1985)); *Abbott v. Michigan*, 474 F.3d 324, 331 (6th Cir. 2007) (quoting *Fellowship of Christ Church,* 758 F.2d at 1144).

The bankruptcy court found that, with the information available during the sale process regarding the Schwabs' insider deals, there was "ample time to, at a minimum, maintain its objection or make further inquiry." *Schwab*, 2016 WL 197570, at *8. Pidcock disagrees, arguing that bankruptcy is unlike traditional litigation and the sale process took place over a short, 60-day time period while the parties were simultaneously involved in numerous other separate matters related to the bankruptcy. According to Pidcock, when the Committee learned of the insider discussions between Oldcastle and the Schwabs several days before the auction and sale hearing, "the Committee had only two options: (1) object to the sale on the basis that it needed time to investigate any potential Oldcastle side deal before consenting to the sale, or (2) allow the sale to go forward. Option one would have doomed the entire bankruptcy case to failure as the lenders had made clear that they were only willing to allow Debtors to continue operating using their cash collateral until the end of May (effectively the date of the sale hearing, the last business day of the month)." (Brief at 454-55.)

But, as Pidcock appears to concede, there were mechanisms available for the Committee to raise its claims concerning breach of fiduciary duty during the bankruptcy sale proceedings. The Committee raised objections concerning the Schwabs' insider deals with CR during the sale process, but chose not to do so with respect to its claims regarding Oldcastle.

The Committee's opinion that pursuing  claims regarding the Schwabs' insider deals with Oldcastle during the sale process would have had a negative impact on the value of the estate may, or may not, have proven true.  (*See* Opp'n at 5962 ("While the banks indicated an initial

17

unwillingness to fund the companies after May, faced with the potential of an additional, significant monetary benefit which, according to Pidcock would have been exposed through investigation, the banks may have relented.").) The Committee balanced the risks and benefits as it saw them and chose not to object to the sale to Oldcastle or make further inquiry during the sale process. The Committee's choice not to assert those claims during the sale process, however, does not mean that it could not do so. *See Fellowship of Christ Church*, 758 F.2d at 1144 ("Appellate review of Judge Thorburn's dissolution order was not full and fair, [plaintiffs] contend, because it offered no opportunity to enter material evidence to factually rebut the circuit court order. The state court defendants, however, freely chose not to move for a new trial at which they could have submitted evidence."); *Matter of AFY, Inc.*, No. AP 14-4060, 2016 WL 869786, at *6 (Bankr. D. Neb. Mar. 7, 2016) (owner's choice not to hire separate counsel for corporation does not constitute lack of full and fair opportunity to litigate claim objections).

Thus, the Court concludes that appellant's argument that element three of res judicata is not satisfied because there was not a full and fair opportunity to pursue the breach of fiduciary duty claims is without merit.

## D. Element 4 - Identity of Cause of Action

> The final element of res judicata requires that there be an identity of claims, which is satisfied if the claims arose out of the same transaction or series of transactions, or if the claims arose out of the same core of operative facts.

*Winget*, 537 F.3d at 580 (citations and internal quotation marks omitted).

Winget argued that his adversary claims did not arise out of the same transaction or operative facts as the bankruptcy proceeding because the sale order did not mention the guaranty documents upon which Winget's claims were based. Pidcock makes a similar argument,

18

contending that his claims are completely different and separate from the facts necessary for approval of the sale order because, in the sale order, "there is no mention of Appellees individually, any of their negotiations with bidders, or their continuing role post sale." (Brief at 460.) But, as the Sixth Circuit ruled in *Winget*, the Court is not required

> to parse the Sale Order to determine whether the final element of res judicata is met. Looking at the Complaint, it is clear that the factual allegations contained therein pertain not just to the Sale Order, but to the larger transactions and facts of Winget and the Defendants' continuous dealings. These were the same transactions and facts on which Winget based its objection to the Sale Order.

*Winget*, 537 F.3d at 581.

The bankruptcy court found that the fourth element of res judicata analysis was satisfied because Pidcock's claims pertain not just to the sale order, but to the larger transactions and facts that were known and raised by Pidcock and the Committee during the Bankruptcy Case:

> Debtors and Defendants were directly and intimately involved in the sale process and were parties to the sale order. The claims now asserted by Plaintiff were raised two times during the sale process and withdrawn. Specific findings in the sale order negate the alleged harm now claimed. While the exact specifics of the side deals may not have been known, there was sufficient information to put the Committee and Plaintiff on notice and provoke additional inquiry. . . . [T]o the extent the present claim was not actually litigated during the sale process, the overlap in the findings supporting the sale order, including findings that the process generated the best price for the assets and the sale was fair and reasonable, and the allegations of this complaint suggesting Defendants' actions harmed the sale process, create an identity between the causes of action for res judicata purposes.

*Schwab*, 2016 WL 197570, at *10.

In so finding, the bankruptcy court distinguished another adversary proceeding in the Bankruptcy Case, *Goddard*, where res judicata did not bar that proceeding. Pidcock contends that this case is like *Goddard*. Although the Schwbs' alleged breach of fiduciary duty occurred and was known during the sale process, Pidcock maintains that the facts necessary to determine

those claims are "completely different and separate from the facts necessary for approval of the sale" and thus, transactionally distinct from the bankruptcy sale. (Brief at 460.) The Court disagrees.

The plaintiff in the *Goddard* proceeding alleged that the debtors' restructuring officer, Laurence Goddard, breached his fiduciary duty by helping the Schwabs negotiate their insider deals with CR and Oldcastle. Goddard argued that Pidcock's claims were barred by res judicata because those claims "necessarily impugn[ed] the good faith finding of the sale[.]" *Goddard*, 2014 WL 5325930, at *11. The bankruptcy court declined to apply the doctrine of res judicata in *Goddard*, however, finding (unlike this adversary proceeding) that the second element of res judicata was not satisfied. *Id.* at *12-13. The bankruptcy court also concluded in *Goddard* that the third prong of res judicata was not satisfied because (unlike this adversary proceeding) affirmative concealment prevented the Committee from asserting its breach of fiduciary claims during the sale process.

> At a minimum, Mr. Pidcock should have had knowledge that the Schwabs were negotiating not only with both the stalking horse bidder, Cement Resources, but also with the ultimate purchaser, OldCastle, and other bidders. The revised bidding procedures alluded to the negotiations and the negotiations were discussed during the sale hearing. Further, counsel for the Committee was directly questioned about the negotiations during the sale hearing. All of this was done before Parkland filed fee applications. . . . [But t]here are no facts that suggest, at the time of the fee applications, Plaintiff had reason to suspect [that Goddard breached his fiduciary duty by helping the Schwabs negotiate their insider deals"].

*Id.* at *11.[16]

---

[16] *Goddard* is factually distinct from the instant action and those differences require a different outcome with respect to the application of res judicata to the two actions. Contrary to appellant's contention, *Goddard* does not constitute the law of the case with respect to the application of res judicata, but arguably constitutes law of the case with respect to the bankruptcy court's finding that Pidcock had knowledge during the sale proceeding that the Schwabs were negotiating insider deals with both CR and Oldcastle.

20

The bankruptcy court did not err in distinguishing the *Goddard* proceeding from this proceeding. Here, not only were Pidcock and the Committee aware of the Schwabs' insider deals before the sale of debtors' assets, the Committee asserted objections regarding the impact of those deals on the valuation of debtors' assets during the sale process. Pidcock's claims in this case for breach of fiduciary duty due to self-dealing by the Schwabs are based on the same transactions and facts that were known in the Bankruptcy Case. Thus, there is an identity of claims between the sale proceedings and the instant litigation, and the fourth element of res judicata is satisfied. *Winget*, 537 F.3d at 581.

**E. Pidcock's Insurance Refund Claims are also Barred by Res Judicata**

With respect to the adversary claim that the Schwabs breached their fiduciary duty by failing to obtain a $3 million dollar insurance refund, this claim is also barred by res judicata. In its objection to debtors' motion for post-petition financing, the Committee asserted that the Schwabs were breaching their fiduciary obligations by refusing to consummate the requirements for the insurance refund. (*See e.g.* Doc. No. 20-66 ¶¶ 17-39.) The Schwabs' failure to obtain the insurance refund was not concealed. Pidcock and the Committee were aware during the Bankruptcy Case of this alleged breach of fiduciary duty, and the potential adverse effect on the estate, and should have brought those claims at that time. Thus, for the same reasons that Pidcock's claims for alleged breach of fiduciary duty with respect to the Schwabs' insider deals with CR and Oldcastle are barred by res judicata, the claims for alleged breach of fiduciary duty with respect to the insurance refund is also barred.

**F. The Court Declines to Adopt the Res Judicata Standard for Bankruptcy Cases From Other Circuits**

Pidcock posits that the law of the Sixth Circuit is too rigid in its application of res judicata in bankruptcy cases, and should adopt the more flexible standards of the Third Circuit and Eleventh Circuit, which limit the application of res judicata after entry of a sale order to claims that were actually litigated or that were essential to the sale process. (Brief at 464-65.) Pidcock argues that this more flexible standard would better further the policies in bankruptcy cases and not require parties to choose between slowing down the bankruptcy process to pursue claims during those proceedings, or be barred from doing so later, by the Sixth Circuit's strict application of res judicata standards to bankruptcy.[17] (*Id.*)

The Sixth Circuit, however, has specifically considered, and rejected, the Third and Eleventh Circuit cases that Pidcock argues should be the standard in this circuit. *Winget*, 537 F.3d at 580-81 (*Eastern Minerals & Chem. Co. v. Mahan,* 225 F.3d 330, 337–38 (3d Cir. 2000) and *Eastman Kodak Co. v. Atlanta Retail, Inc. (In re Atlanta Retail, Inc.),* 456 F.3d 1277, 1280 (11th Cir. 2006) discussed in context of the fourth res judicata factor). Moreover, the obligation of this Court and the bankruptcy court is to apply the law of the Sixth Circuit to this case, not to follow the decisions of other circuits. *In re Higgins*, 159 B.R. 212, 215 (S.D. Ohio 1993) ("The general rule, of course, is that the district courts are bound by decisions of the Sixth Circuit even if decisions from other circuits seem more persuasive.").

For the reasons stated above, the Court concludes that the bankruptcy court did not err in applying Sixth Circuit law to this case.

---

[17] Similar issues and concerns were extensively discussed by the bankruptcy court in dicta, some of which, unfortunately, form the basis of Pidcock's arguments on appeal.

22

## IV. APPEAL OF ORDER DENYING MOTION
## TO STRIKE AFFIRMATIVE DEFENSES

### A. Standard of Review

The bankruptcy court's order denying the creditor trustees' motion to strike defendant/appellee's affirmative defenses is an interlocutory order. *In re Midway Motor Sales, Inc.*, 2009 WL 1940719, at *1 (citations omitted). This interlocutory order, however, merges with the bankruptcy court's final order granting summary judgment in this case and may be appealed by filing a timely notice of appeal of the final judgment. *See id*. at *2.

"Bankruptcy court orders striking affirmative defenses and dismissing cross-claims, and disapproving a proposed settlement or compromise are reviewed for abuse of discretion. An abuse of discretion occurs only when the court relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard." *Id.* (internal quotation marks and citations omitted). "Whether the bankruptcy court's discretionary decision is based upon an erroneous interpretation of the law is a legal question that is reviewed *de novo*. Regardless, the decision of the bankruptcy court can be affirmed if it is correct for any reason, including a reason not considered by that court." *In re Anderson*, 377 B.R. 865, 868 (B.A.P. 6th Cir. 2007), *abrogated on other grounds by Schwab v. Reilly*, 560 U.S. 770, 130 S. Ct. 2652, 177 L. Ed. 2d 234 (2010) (internal quotation marks and citations omitted).

### B. Bankruptcy Court did not Err in Denying Pidcock's Motion to Strike Affirmative Defenses

After considering the parties' brief and entertaining oral argument on Pidcock's motion to strike the Schwabs' affirmative defenses, the bankruptcy court found that "there is no controlling authority or requirement in the Sixth Circuit or in the Ohio District Courts that the pleading

standards set forth in *Bell Atl. Corp. v. Twombly*, 550 U.S. 544[, 127 S. Ct. 1955, 167 L. Ed. 2d 929] (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662[, 129 S. Ct. 1937, 173 L. Ed. 2d 868] (2009) apply to affirmative defenses." (Order at 4228.) The bankruptcy court therefore declined to apply such pleading standards to affirmative defenses and denied Pidcock's motion to strike. (*Id*.) On appeal, Pidcock acknowledges that there is no clear answer because the Sixth Circuit has not yet ruled on this issue, but urges this Court to do so on appeal because some Ohio district courts have applied the plausibility standard of *Twombly* and *Iqbal* to affirmative defenses. (Brief at 469.)

The Sixth Circuit has not yet addressed this issue. *Depositors Ins. Co. v. Estate of Ryan*, 637 F. App'x 864, 869 (6th Cir. 2016). Indeed, appellant cites no cases from any circuit court that has. The current law in the Sixth Circuit is that an affirmative defense may be pleaded in general terms and is sufficient "'as long as it gives plaintiff fair notice of the nature of the defense.'" *Lawrence v. Chabot*, 182 F. App'x 442, 456 (6th Cir. 2006) (quoting 5 Wright & Miller, *Federal Practice and Procedure* § 1274). Moreover, in a post-*Twombly/Iqbal* decision, the Sixth Circuit found that the Federal Rules of Civil Procedure do not require a heightened pleading standard for a statute of repose defense. *Montgomery v. Wyeth*, 580 F.3d 455, 468 (6th Cir. 2009).

This Court has previously held that "'[a]n affirmative defense may be pleaded in general terms and will be held to be sufficient . . . as long as it gives plaintiff fair notice of the nature of the defense.'" *Chiancone v. City of Akron*, No. 5:11CV337, 2011 WL 4436587, at *2 (N.D. Ohio Sept. 23, 2011) (quoting *Lawrence*, 182 F. App'x at 456); *see also Jam Tire, Inc. v. Harbin*, No. 3:14-cv-00489, 2014 WL 4388286, at *2-3 (N.D. Ohio Sept. 5, 2014) (rejecting a heightened

24

pleading standard for affirmative defenses, and noting a "majority trend" that "cut[s] against the proposition"); *Sodexo Mgmt., Inc. v. Benton Harbor Area Sch. Dist.*, No. 1:15-CV-878, 2016 WL 845338, at *8 (W.D. Mich. Mar. 2, 2016) (concluding that the "fair notice" standard remains intact in the Sixth Circuit with respect to affirmative defenses, and declining to apply the *Twombly/Iqbal* standard) (citing among other authority *Montgomery*); *Farivar v. Lawson*, No. 3:14-CV-76-TAV-HBG, 2017 WL 149970, at *6 n.1 (E.D. Tenn. Jan. 13, 2017) (following *Lawrence* and *Montgomery* in declining to apply heightened pleading standard to affirmative defenses).

The Court acknowledges that some Ohio district courts have concluded that the *Twombly/Iqbal* heightened pleading standard applies to affirmative defenses. *See e.g. HCRI TRS Acquirer, LLC v. Iwer*, 708 F. Supp. 2d 687, 691 (N.D. Ohio 2010). The majority of courts considering this issue, however, have concluded to the contrary. *Vary v. City of Cleveland*, No. 1:16-CV-00037, 2016 WL 3085311, at *1 (N.D. Ohio June 2, 2016) ("This Court follows the majority approach in finding that the *Iqbal* and *Twombly* pleading requirements do not apply to affirmative defenses.").

Accordingly, the Court finds that the bankruptcy court did not err in denying Pidcock's motion to strike the Schwabs' affirmative defenses.

## V. CONCLUSION

For all of the foregoing reasons, plaintiff/appellant's appeal is denied. The bankruptcy court's order (and accompanying memorandum of decision) granting defendants/appellees' motion for summary judgment, and order denying plaintiff/appellant's motion to strike defendants/appellees' affirmative defenses, are AFFIRMED.

**IT IS SO ORDERED**.

Dated: March 28, 2017

_____
**HONORABLE SARA LIOI**
**UNITED STATES DISTRICT JUDGE**